IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 17-cv-02645-RBJ

ZEN MAGNETS, LLC,

     Plaintiff,

v.

UNITED STATES OF AMERICA CONSUMER PRODUCT SAFETY COMMISSION,

     Defendant.

---

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

---

This matter is before the Court on plaintiff Zen Magnets' ("Zen") and defendant U.S. Consumer Product Safety Commission's (the "Commission") cross-motions for summary judgment. ECF Nos. 35, 36. For the reasons stated herein, the Commission's Final Decision and Order is reversed and remanded with instructions to grant Zen a fair opportunity to participate in the Complaint Counsel's appeal of the ALJ's Initial Decision and Order before an impartial tribunal.

## I. BACKGROUND

**A. <u>Factual Background</u>.**

Zen markets and sells sets of high-powered small rare earth magnets ("SREMS"). These magnets are small (on the order of five millimeters in diameter), spherical, coated in reflective silver, and highly powerful. Zen sells its magnets, known as "Zen Magnets" and "Neoballs" (referred to collectively herein as the "magnets") individually or in sets of 76, 216, or 1,728 magnets. ECF No. 35 at 2. The magnets can be separated and rearranged in various geometric

shapes. Zen markets and sells its magnet sets for educational and scientific purposes, for stress relief, and as toys for adults that can be used for jewelry or refrigerator art, among other things. ECF No. 1-2 at 18.

SREMs have been implicated in injuries to children and adolescents who swallow the magnets. Young children who come across spare or lost magnets have been known to ingest them accidentally or intentionally, whereas older children and adolescents may accidentally ingest the magnets while simulating tongue piercings or sticking the magnets to their braces. ECF No. 35 at 2. When two or more magnets—or one magnet and a metallic object—are ingested, they can cause intestinal damage. Due to their strength, ingested magnets can pinch or perforate digestive tissue as they are attracted toward each other within the gastrointestinal system. *Id.* at 3. Injuries caused by ingestion of SREMs include perforations, infections, tissue death, and gastrointestinal bleeding; such injuries have resulted in one death. ECF No. 1-2 at 22–23. The dangers of ingestion are exacerbated because many medical professionals and parents are unaware that children have ingested the magnets or that they pose such grave risks.

## B. **Procedural Background.**

This matter originated in August 2012 when the Commission's Complaint Counsel commenced an administrative adjudication against Zen and two other companies distributing SREMs. Complaint Counsel filed a complaint against the firms under Sections 15(c) and (d) of the Consumer Product Safety Act ("CPSA")[1] seeking to have the SREMs declared a substantial product hazard and to obtain a public notice and recall of the magnets. ECF No. 1-2 at 1 (Final Decision and Order). The cases against Zen and the other firms were consolidated before

---

[1] "Sections 15(c) and (d) of the CPSA prescribe the remedies that the Commission may order if the Subject Products present a substantial product hazard under either Section 15(a)(1) or (a)(2)." ECF No. 1-2 at 4.

Administrative Law Judge ("ALJ") Dean Metry, and the two other firms entered consent agreements with the Commission in 2014, leaving only Zen in the adjudication.

Also in August 2012, the Commission commenced a rulemaking to establish safety standards for magnet sets. ECF No. 40-1. The rule was finalized in October 2014. ECF No. 1 at 7. At the time the rule was issued, Zen was the only remaining distributor of SREMs in the American market. Safety Standard for Magnet Sets, 79 Fed. Reg. at 59,962–63 (Oct. 3, 2014). The Commission's final rule set an industry-wide standard limiting the size and magnetic strength of SREMs. *See id.* However, the Tenth Circuit vacated and remanded the rule in November 2016 after a challenge from Zen, because the Commission's "prerequisite factual findings . . . are incomplete and inadequately explained." *Zen Magnets, LLC v. CPSC*, 841 F.3d 1141, 1144 (10th Cir. 2016).

As a result of the Commission's rulemaking, Zen sought dismissal of the Complaint Counsel's Second Amended Complaint in the adjudication proceeding before ALJ Metry in October 2014. ECF No. 1 at 3. Zen argued that the rulemaking demonstrated that the Commissioners were biased against Zen and had prejudged the facts in its case. *Id.* at 3–4. ALJ Metry denied this motion. *Id.* After a hearing in December 2014, ALJ Metry issued his Initial Decision and Order on March 25, 2016 granting in part and denying in part Complaint Counsel's request for relief. *Id.* at 4. The ALJ found that Complaint Counsel had not proved the magnets were a hazard when accompanied with proper warnings and allowed Zen to continue selling its magnets with warnings. *See id.*

On May 4, 2016 Complaint Counsel appealed the ALJ's Initial Decision to the Commission for review. *Id.* Zen moved to stay the appeal pending a decision on its contemporaneously-filed Motion to Disqualify the Commission or Some of its Members for bias.

Zen Magnets, LLC, CPSC Docket 12-2, Nos. 144, 145.  The Commission denied Zen's motion to stay as well as its motion to disqualify, though Commissioner Buerkle dissented from that decision, contending that her colleagues should be disqualified from hearing the appeal.  *See* Zen Magnets, LLC, CPSC Docket 12-2, Nos. 152, 155.

The Commission heard oral argument on the Complaint Counsel's appeal in June 2017 and issued its Final Decision and Order ("FDO") on October 26, 2017.  *Id.* at 163.  In the FDO, the Commission overturned ALJ Metry's Initial Decision, finding that it was "based on numerous errors in fact and law."  ECF No. 1-2 at 1.  Contrary to the ALJ's decision, the FDO found that the magnets at issue "present a substantial product hazard and are, therefore subject to public notification . . . and recall measures."  *Id.*

On November 6, 2017 Zen Magnets filed its complaint for injunctive and declaratory relief with this Court and moved for a preliminary injunction to enjoin enforcement of the FDO.  *See* ECF Nos. 1, 2.  After briefing and an oral argument on the motion for a preliminary injunction, the parties stipulated that the Commission would temporarily stay its enforcement of paragraph 2 of the FDO for 120 days, during which time the parties would submit cross-motions for summary judgment.[2]  *See* ECF Nos. 20, 21, 24, 26.  The parties' cross-motions for summary judgment have been fully briefed.  *See* ECF Nos. 35, 36, 39, 40.  The Administrative Record has also been filed.  *See* ECF Nos. 44–46.

In its complaint Zen seeks to enjoin the Commission's FDO on the grounds that the Commission violated Zen's due process rights because its members were biased and had prejudged the matters on appeal.  ECF No. 1 at 5.  Zen also seeks to set aside the FDO under the Administrative Procedure Act ("APA"), codified at 5 U.S.C. §§ 702, 706(2) for being arbitrary and capricious; contrary to constitutional right; and/or unsupported by substantial evidence.  *Id.*

---

[2] On May 23, 2018 the parties stipulated to extend the stay for another 120 days.  ECF No. 48.

The Commission asks the Court to affirm the FDO and dismiss Zen's complaint, whereas Zen asks the Court to grant summary judgment on all the claims in its complaint. ECF No. 35 at 1; ECF No. 36 at 1.

## II. STANDARD OF REVIEW

Though the present motions are styled as cross-motions for summary judgment, in effect they are motions to have the Court decide Zen's appeal of the Commission's FDO. "[M]otions for summary judgment are conceptually incompatible with the very nature and purpose of an appeal," and are "inconsistent with the standards for judicial review of agency action under the APA." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579–80 (10th Cir. 1994).[3] As such, the Court's review of these motions is governed by the APA.[4]

Under the APA, the Court must set aside an agency's decision if, after reviewing the administrative record, the Court finds that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to constitutional right, power, privilege, or immunity," *id.* at § 706(2)(B), or "unsupported by substantial evidence," *id.* at § 706(2)(E). Agency actions are presumed valid, and the burden of proof lies with plaintiffs who challenge such actions. *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008).

---

[3] Under similar circumstances in an ERISA case, the Tenth Circuit observed that "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *Palmer v. Metro. Life Ins. Co.*, 415 F. App'x 913, 916 (10th Cir. 2011) (citation omitted).

[4] Despite conceding that a motion for summary judgment is inappropriate for an administrative appeal, Zen contends that summary judgment is appropriate for its due process claim against the Commission. ECF No. 36 at 8. I disagree. Zen's due process claim against the Commission is reviewed under the framework of the APA, under which a court shall set aside agency action if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(b).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). An agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* Moreover, in reviewing an agency's explanation for its action, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citation omitted). An agency is owed especially strong deference when "the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Utah Envtl. Cong. v. Dale Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006) (citation omitted).

Zen also seeks to overturn the Commission's FDO because it is not supported by substantial evidence. "'Substantial evidence' is more than a mere scintilla; it must be such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . Evidence is not substantial if it is overwhelmed by other evidence . . . or if it constitutes mere conclusion." *Olenhouse*, 42 F.3d at 1581 (internal citations omitted). "The substantial-evidence standard does not allow a court to displace the agency's 'choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been

before it *de novo*.'" *Trimmer v. U.S. Dep't of Labor*, 174 F.3d 1098, 1102–03 (10th Cir. 1999)

(quoting *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 405 (1962) (per curiam)).

The APA also requires the Court to set aside any agency decision that is "contrary to

constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Though the parties

appear to disagree about the appropriate standard of review to apply to Zen's constitutional

claim, they both concede that a constitutional claim does not take the Court's review outside the

"*procedural framework* of the APA." ECF No. 29 at 13 (emphasis in original); *see also* ECF

No. 35 at 5. With respect to constitutional claims arising under the APA,

> "[C]ourts afford agencies no deference in interpreting the Constitution. . . . The
> presence of a constitutional claim does not take a court's review outside of the
> APA, however . . . and courts must still respect agency fact-finding and the
> administrative record when reviewing agency action for constitutional infirmities;
> they just should not defer to the agency on issues of substantive legal
> interpretation."

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 305 F.R.D. 256, 289 (D. N. M. 2015).

### III. ANALYSIS

Two issues are raised in this action: (1) whether the FDO violated the APA because it is

arbitrary and capricious or unsupported by substantial evidence; and (2) whether Zen was denied

due process as a result of the Commission's alleged bias and prejudgment of the facts and law at

issue in the FDO.

### A. <u>APA Claim.</u>

In the FDO the Commission determined that the magnets contain a defect because they

create a risk of injury based on operation or use, including reasonably foreseeable misuse. ECF

No. 1-2 at 15. The Commission observed that the magnets' characteristics create a risk of injury

because they are small, loose, separable, and strongly magnetic. *Id.* at 16. The Commission also

rejected Zen's argument that warnings could mitigate the risk of injury. *Id.* at 8–9.

As noted above, an agency action is arbitrary and capricious if the agency (1) failed to consider the relevant statutory factors; (2) relied on factors which Congress has not intended it to consider; (3) entirely failed to consider an important aspect of the problem; or (4) offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs.*, 463 U.S. at 43. I agree with the Commission that its FDO does not reflect any of these deficiencies. However, Zen raises several discrete reasons it contends the FDO was arbitrary and capricious and unsupported by substantial evidence.

First, Zen contends the Commission's reading of its defect regulation was arbitrary and capricious because the Commission included foreseeable misuse and ignored the dictionary definition of defect. ECF No. 36 at 18, 22. Second, Zen argues that the Commission's design defect finding was arbitrary and capricious because the Commission relied on the magnets' separability and on allegedly faulty expert testimony with no other evidence of a defective design. *Id.* at 20–21. Last, Zen contends that the Commission's finding that Zen's warnings were defective was arbitrary and capricious because it ignored certain data and ingestion incident reports. *Id.* at 21–22. I will address each argument in turn.

1. Defect Regulation.

In the FDO, the Commission decided that the magnets present a substantial product hazard, which is defined in Section 15(a)(2) of the CPSA as "a product *defect* which (because of the pattern of defect, the number of defective products distributed in commerce, the severity of the risk, or otherwise) creates a *substantial risk of injury* to the public." 15 U.S.C. § 2064(a)(2) (emphases added). The Commission found that (1) the magnets contain a design defect that creates an ingestion risk based on their use and operation, including reasonably foreseeable

8

misuse; and (2) warnings do not and cannot mitigate the risk of injury. ECF No. 1-2 at 8. Zen argues that the Commission's reading of its defect regulations was arbitrary and capricious because the Commission considered foreseeable misuse and ignored the dictionary defect of defect.

The Commission is granted broad latitude to interpret "defect" in the context of this section of the CPSA. *See* Interpretation, Policy, and Procedure for Substantial Product Hazards, 43 Fed. Reg. 34,988, 34,991 (Aug. 7, 1978) (the Commission "interprets the term defect as used in Section 15(b) to include the broadest meaning found in Federal and State statutes and judicial pronouncements.")). In considering whether the product contains a defect that creates a substantial risk of injury to the public, the Commission need not "'write an exegesis on every contention. What is required is merely that it consider the issues raised and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted.'" *Becerra-Jimenez v. I.N.S.*, 829 F.2d 996, 1000 (10th Cir. 1987) (quoting *Osuchukwu v. INS*, 744 F.2d 1136, 1143 (5th Cir. 1984)).

The regulations describe a defect as follows:

At a minimum, defect includes the dictionary or commonly accepted meaning of the word. Thus, a defect is a fault, flaw, or irregularity that causes weakness, failure, or inadequacy in form or function. A defect, for example, may be the result of a manufacturing or production error; that is, the consumer product as manufactured is not in the form intended by, or fails to perform in accordance with, its design. In addition, the design of and the materials used in a consumer product may also result in a defect. Thus, a product may contain a defect even if the product is manufactured exactly in accordance with its design and specifications, if the design presents a risk of injury to the public. *A design defect may also be present if the risk of injury occurs as a result of the operation or use of the product* or the failure of the product to operate as intended. A defect can also occur in a product's contents, construction, finish, *packaging, warnings, and/or instructions*. With respect to instructions, a consumer product may contain a defect if the instructions for assembly or use could allow the product, otherwise safely designed and manufactured, to present a risk of injury.

16 C.F.R. § 1115.4 (emphases added).  The regulations also provide a list of factors the

Commission will consider, as appropriate, to determine "whether the risk of injury associated

with a product is the type of risk which will render the product defective":

> The utility of the product involved; the nature of the risk of injury which the
> product presents; the necessity for the product; the population exposed to the
> product and its risk of injury; the obviousness of such risk; the adequacy of
> warnings and instructions to mitigate such risk; *the role of consumer misuse of the
> product and the foreseeability of such misuse*; the Commission's own experience
> and expertise; the case law interpreting Federal and State public health and safety
> statutes; the case law in the area of products liability; and other factors relevant to
> the determination.

*Id.* (emphasis added).

> a. <u>Dictionary Definition</u>.

Zen argues that the Commission erred because it decided not to follow the dictionary

definition of "defect" and did not explain this decision.  ECF No. 36 at 22–23.  It is not clear,

however, that the Commission is required to explicitly consider the dictionary definition, since

this definition arises in a regulatory section guiding manufacturers, importers, distributors, and

retailers about when to report a design defect and how the Commission interprets the concept of

a design defect.  *See* 16 C.F.R. § 1115.4.  Thus, the guidance provided here is meant to elucidate

the Commission's interpretation, but it does not contain any mandatory language indicating that

the Commission is limited to the dictionary definition found therein.  As noted above, the section

referencing the dictionary definition also includes various ways to define and conceptualize

"defect."  Because the Commission enjoys great latitude in interpreting the term, the reference to

a dictionary definition should not be interpreted as limiting the Commission's discretion.

Moreover, the FDO reflects that the Commission did consider the dictionary definition of

defect.  *See* ECF No. 1-2 at 9 ("Thus, a defect is a fault, flaw, or irregularity that causes

weakness, failure, or inadequacy in form or function.").  The Commission considered the faults

and flaws in the magnets' design and warnings that contributed to their defect.  ECF No. 35 at 7.

As such, even if the Commission did not use the precise words from the dictionary definition in

conveying its conclusion, the gravamen of the Commission's finding of a defect comported with

the dictionary definition.

Thus, given the context of the regulation's reference to the dictionary definition along

with the other factors the Commission can and did consider in this case, the fact that the

Commission did reflect its awareness of the dictionary definition of defect, and the gravamen of

the Commission's finding that comported with this definition, I am not troubled by the

Commission's not using the exact verbiage found in the dictionary definition of defect.

   b. Foreseeable Misuse.

Zen's next argument is more substantive.  Zen disputes the Commission's finding that the

magnets are defective solely as a result of their foreseeable misuse.  In the FDO, the Commission

highlighted "[t]he most fundamental flaw resulting in misapplication of the law in the ALJ's

Initial Decision," which the Commission asserted was "the erroneous assertion that the

[Commission] cannot protect consumers from hazards resulting from reasonably foreseeable

misuse of a consumer product."  ECF No. 1-2 at 10.  The Commission conceded that ingestion

constituted misuse of the magnets, but it concluded that reasonably foreseeable misuse was

contemplated in the regulation's provision referring to "the operation and use of the product."

*Id.* at 11 (referring to 16 C.F.R. § 1115.4).  In so finding, the Commission relied on the

regulation's two references to foreseeable misuse; the legislative history of the CPSA, which

included discussions of misuse; and case law reflecting the Commission's authority to address

misuse.  *Id.* at 11–15.

The Court's "review of an agency's interpretation of its own regulations is 'substantially deferential.'" *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 794 (10th Cir. 2010) (citation omitted)). The Court is not to "'decide which among several competing interpretations best serves the regulatory purpose,'" but instead is to "give the agency's interpretation 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Id.* (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). The Court must defer to the agency's interpretation "'unless an alternative reading is compelled by the regulation's plain language'" or by other indications of the agency's intent at the time the regulation is promulgated. *Id.* (quoting *Shalala*, 512 U.S. at 512).

I am not persuaded by Zen's contention that the Commission's interpretation is owed little deference because the regulation at 16 C.F.R. § 1115.4 is merely interpretive. ECF No. 39 at 3. Zen contends that this regulation gives the Commission only the power to persuade, rather than "unfettered deference in its application of that rule." *Id.* (citing *Drake v. Honewell, Inc.*, 797 F.2d 603, 607 (8th Cir. 1986)). In *Drake*, the Eighth Circuit held that an agency cannot "ground legal action in a violation of its interpretive rule" but instead must demonstrate that the underlying statute has been violated. *Id.* at 607. Nonetheless, the court emphasized that "[c]ertainly a court should give great weight to an agency's interpretation, *as reflected in its interpretive rule*, of the statute it administers, to determine the scope of the statute and whether it has been violated." *Id.* (emphasis added). As a result, even though the regulations at 16 C.F.R. § 1115.4 are interpretive and do not serve as the basis for stating a legal claim, the Commission's interpretation of these regulations is still owed deference.

Because the Commission's interpretation is consistent with the regulation's plain language, I will give it controlling weight. My conclusion on this point is principally supported

by the regulation's two references to foreseeable misuse. First, one of the ten factors the Commission may consider in determining whether there is a defect is "the role of consumer misuse of the product and the foreseeability of such misuse." 16 C.F.R. § 1115.4. Although "the factors listed in § 1115.4 do not present a separate basis for a defect finding," ECF No. 1-2 at 8 n.6, the inclusion of this factor supports the Commission's reliance on reasonably foreseeable misuse here.

Second, the regulation provides the following example to explain the concept of "defect" as it is used in the CPSA, in which a tool is deemed to contain a defect because reasonably foreseeable misuse based partially on inadequate instructions could cause an injury:

> (d) A power tool is not accompanied by adequate instructions and safety warnings. *Reasonably foreseeable consumer use or misuse*, based in part on the lack of adequate instructions and safety warnings, *could result in injury*. Although there are no reports of injury, the product contains a defect because of the inadequate warnings and instructions.

16 C.F.R. § 1115.4 (emphases added). Zen argues that "the drill was misused *because* it contained a defective warning; it was not defective *because* it was misused." ECF No. 36 at 19 (emphases in original). I am not persuaded by this attempt to distance the finding of a defect from the reasonably foreseeable misuse. Although adequate instructions and safety warnings might prevent misuse of a drill, and the warnings are indeed relevant for that reason, the example still turns on a finding of a defect because of an injury caused by reasonably foreseeable use *or misuse*. Thus, the example shows that misuse can be a basis for finding a product defective, and as such lends support for the Commission's finding.

Providing additional support for the Commission's position, the Fifth Circuit found that reasonably foreseeable misuse may support a defect finding. *See Southland Mower Co. v. Consumer Product Safety Comm'n*, 619 F.2d 499, 513 (5th Cir. 1980). In *Southland*, the

Commission issued a rule that in part required that lawnmowers be designed to prevent consumers from defeating shielding safety devices. The Fifth Circuit rejected a manufacturer's challenge to the Commission's obstruction test requirement finding that "it is reasonably necessary to guard against intentional consumer defeat of" a safety device on a lawnmower. *Id.* "Congress intended for injuries resulting from foreseeable misuse of a product to be counted in assessing risk." *Id.* As such, *Southland* supports the Commission's stance that it may consider foreseeable misuse when it determines that there is a defect.

I conclude that the Commission was entitled to assess the reasonably foreseeable misuse of the magnets in determining the existence of a defect.

2. Commission's Finding of a Design Defect.

Zen also contends that there was not substantial evidence to support the Commission's finding of a defect based on the magnets' separability. Zen argues that the Commission relied only on the testimony of Dr. Frantz to establish a design defect based on separability, but that Dr. Frantz was qualified only as a human factors expert to comment on the use of warnings, not to testify as to a design defect. ECF No. 36 at 20–21. The Commission counters that the FDO contained "page after page of analysis" that the magnets were separable, thereby creating a defect. ECF No. 40 at 16. Zen does not dispute the separability of the magnets but instead contends that there is no evidence that the magnets' separability causes a defect.

I disagree and find that the Commission's finding that the magnets have a defective design because they are separable is supported by substantial evidence. *See Honeyville Grain, Inc. v. N.L.R.B.*, 444 F.3d 1269, 1277 (10th Cir. 2006) ("'The 'substantial evidence' test *itself* already gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree that *could* satisfy a

reasonable factfinder.'") (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998)).  As the Commission points out, it considered a variety of evidence on the issue of the design defect posed by the magnets' separability.  ECF No. 40 at 16–17.  This evidence included Dr. Frantz's analysis of 95 incident reports and In-Depth Investigations about magnet ingestion incidents which illustrated the many ways children gain access to magnets; Zen's marketing of the products as a manipulative toy requiring that the magnets be separated to create and reshape them into structures, jewelry, or art; the fact that Zen sells spare magnets to assist consumers who lost magnets; and the fact that the magnets can be lost even when used as intended and even by experienced users.  ECF No. 1-2 at 17-19.  This evidence is supportive of a conclusion that despite users' best intentions, the magnets are likely to be separated and end up in a place where a child can easily ingest them despite warnings or contraindications.

Further, I disagree with Zen's argument that the Commission was not justified in relying on Dr. Frantz's testimony to establish that the magnets are defective in their design.  *See* ECF No. 36 at 21.  Dr. Frantz testified as an expert in human behavior that "given the characteristics of the product, you cannot appropriately address the hazard with a warnings approach."  ECF No. 44-5 at 342:4–11.  He noted that inherent in the design of the magnets was the fact that they are meant to separate from the group easily, and that when they separate, they pose a hazard to children.  *Id.* at 342:14–21; 344:1–3.  Zen objected to Dr. Frantz's testimony on the grounds that he was testifying about a design defect, "which is a different discipline."  *Id.* at 344:7–9.  However, the ALJ agreed with Complaint Counsel's argument that "key to the understanding of whether a warning can mitigate a hazard is what is the hazard, what are you warning about."  *Id.* at 344:13–15.  As a result, the ALJ overruled Zen's objection, noting with respect to Dr. Frantz's

testimony that "in the context of how that relates to his warning, it is within his expertise and is helpful to me." *Id.* at 344:21–345:4.

Thus, I agree with the Commission that it was justified in taking into account Dr. Frantz's testimony as to the nature of the hazard that arises from the magnets' separability. Moreover, even if the ALJ's overruling Zen's objection could be read as limiting the use of Dr. Frantz's observations, the Commission is right that it was entitled to modify the ALJ's findings with respect to this testimony. *See Mattes v. United States*, 721 F.2d 1125, 1129 ("[T]he agency is free to substitute its judgment for that of the ALJ.").

Because I am satisfied that the Commission's finding of a design defect arising from the magnets' separability was supported by substantial evidence, Zen's argument on this point is not a ground for overturning the FDO.

3. Commission's Finding that Warnings are Defective.

Zen argues that the Commission's finding that Zen's warnings are defective was arbitrary and capricious. Zen says that the Commission ignored National Electronic Injury Surveillance System ("NEISS") data and ingestion incident reports that showed the very low rate of Zen's involvement in these incidents, which indicates that Zen's warnings were effective. ECF No. 36 at 21–22 (Zen contends that it was involved in two incidents, which amounted to 0.0069% of all the alleged ingestions). Zen also argues that the Commission's inconsistent treatment of the data in the FDO was arbitrary and capricious. *Id.* at 22. I am not persuaded by either argument.

Zen's focus on the Commission's allegedly deficient analysis of the injury data does not detract from the Commission's otherwise thorough analysis supporting its conclusion that warnings are not effective at preventing injuries from SREMs. *See* ECF No. 1-2 at 30–33. The Commission highlighted evidence and expert testimony that the risk of injury from SREMs

occurs when magnets are separated from their set "so that even the best warning is unlikely to be seen by the user," that 69 percent of children who ingested magnets would not have seen a warning because of the way they found or received the magnets, and that packaging bearing warnings is often discarded. *Id.* at 31–33. Additionally, caregivers often discount warnings or misunderstand the hazard, and because of the characteristics of the magnets (easily separated and lost), even those consumers exercising ordinary care cannot in fact "follow the basic warning message" to keep magnets away from children. *Id.* Finally, the Commission observed that Zen's warnings trivialized or detracted from the risks by taking an unconventional, "tongue-in-cheek" approach. *Id.* at 33.

In addition to addressing these warning label limitations, the Commission also assessed the injury data that Zen references, which indicate that Zen's magnets were implicated in two injuries, whereas other SREMs have been associated with dozens of incidents. *Id.* at 34. The Commission criticized the ALJ's conclusion that Zen's warnings were effective, noting that Zen had not submitted any evidence to support that conclusion. *Id.* The ALJ had found a correlation between a competitor's lack of warnings and higher number of incidents and a correlation between Zen's warnings and relative lack of incidents. The ALJ concluded that warnings were effective at preventing incidents. *Id.* The Commission was not satisfied with this conclusion, observing that "neither party presented actual evidence concerning what conclusions, if any, could be drawn from these data." *Id.* Though a court might come to a different conclusion if it were in the Commission's role, that does not render the Commission's finding arbitrary and capricious. *See Trimmer*, 174 F.3d at 1102–03. Moreover, as noted, the Commission's conclusions about the injury data were only a small part of the rationale informing its decision

that the warnings were insufficient. I am satisfied that when taken in context with the remainder of the Commission's findings about warnings, its treatment of the injury data was sufficient.

Additionally, I am not convinced that the Commission's decision to use the NEISS data differently for different reasons was arbitrary and capricious. In the FDO, the Commission stated that it would "not rely on NEISS data and the Magnet Incident Memo for injury estimates, but will consider the information as instructive regarding the population exposed to the risk of injury from magnet ingestions." ECF No. 1-2 at 29 n.28. Zen says this statement was contradicted by the Commission's later indication that it "considered injury estimates gathered from hospital admission data reported in the [NEISS]" but did not rely on them. ECF No. 39 at 5. It is not clear why Zen alleges this is inconsistent, since both statements indicate the Commission will *not rely* on NEISS data.

Second, Zen argues that if the NEISS data were unreliable for one use (injury estimates), they should also have been deemed unreliable for another (the population affected). *Id.* I disagree. The Commission's decision not to rely on the NEISS data or the Magnet Incident Memo incorporating that data was based on the Tenth Circuit's observation that these data— which the Commission relied upon in promulgating its final rule—did not provide sufficient certainty about the source of injuries caused by magnets. *Zen Magnets, LLC v. Consumer Product Safety Comm'n*, 841 F.3d 1141, 1144 (10th Cir. 2016). The Tenth Circuit's decision did not cast doubt on the conclusion derived from these data that children are affected by magnet ingestions. Thus, the Commission's decision not to use these data for injury estimates but to consider this information "as instructive regarding the population exposed to the risk of injury" was reasonable. ECF No. 1-2 at 29 n.28. Moreover, Zen does not dispute that children are the

population most affected by magnet ingestions, so its objection to the use of these data for that harmless conclusion is more bluster than substance.

Thus, as noted, though Zen disputes the Commission's treatment of the injury data as arbitrary and capricious, the Commission explained its decision about these data. Moreover, these data were not the sole foundation for the Commission's finding that warnings are not effective with respect to Zen's magnets, and the Commission explained its decision about the insufficiency of warnings with reference to other factors. As a result, the Commission's finding with respect to warnings was not arbitrary and capricious.

## B. **Due Process Claims**.

Because I have found that the FDO withstands APA review, I may reach Zen's constitutional argument. *See Olenhouse*, 42 F.3d at 1580 ("[F]ederal courts should decline to rule on constitutional issues unless necessary.") (internal citation omitted). Zen claims that the Commission violated its Fifth Amendment Due Process right to an impartial tribunal in the appeal of the ALJ's Initial Decision and Order before the Commission, which resulted in the FDO. Zen contends that the Commissioners were biased against Zen and prejudged the key questions of fact and law when they promulgated a safety standard for SREMs and made public statements about Zen and about the rule. ECF No. 1 at 19–23.

The Due Process Clause provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "Impartiality of the tribunal is an essential element of due process." *Riggins v. Goodman*, 572 F.3d 1101, 1112 (10th Cir. 2009) (internal citation omitted). However, because administrative adjudicators are entitled to a "presumption of honesty and integrity," "there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being

adjudicated." *Id.* (internal quotation and citation omitted). The fact that an agency has

"'familiarity with the facts of a case gained . . . in the performance of its statutory role'" will not

disqualify the decisionmakers or demonstrate actual bias. *Id.* (quoting *Hortonville Joint Sch.*

*District No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976)). Similarly, the fact that an

agency entertained certain "'views as the result of its prior ex parte investigations did not

necessarily mean that the minds of its members were irrevocably closed on the subject.'" *Id.*

(quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

 1. <u>Related Rulemaking</u>.

 Zen argues that the Commissioners prejudged the key questions of fact and law in Zen's

appeal when the Commission issued its magnet safety rule limiting the magnetic strength of

SREMs. Safety Standard for Magnet Sets, 79 Fed. Reg. at 59,986. However, the fact that the

Commission issued a rule on the subject does not demonstrate that the Commissioners' minds

were "irrevocably closed" on the issue of whether Zen's magnets should be recalled. Indeed,

courts have found that agency members may investigate, institute proceedings, and then

adjudicate claims without being found biased. The "contention that the combination of

investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in

administrative adjudication has a . . . difficult burden of persuasion to carry." *Withrow*, 421 U.S.

at 47. "The mere exposure to evidence presented in nonadversary investigative procedures is

insufficient in itself to impugn the fairness of the Board members at a later adversary hearing."

*Id.* at 55. Zen concedes that the Commission did not necessarily prejudge the issues in the

adjudication simply by having promulgated a related rule. *See* ECF No. 36 at 14 (the

"Commission was free to initiate a rulemaking and administrative action simultaneously.").

Nonetheless, Zen argues that the Commissioners prejudged the issues in its case because (1) the rulemaking and adjudication resolved the same "core issue," namely "whether the [magnets] should remain on the market"; (2) the proceedings both addressed the same factors and evidence to resolve that issue; and (3) the proceedings both sought prospective relief to bar Zen from selling the magnets in the future. ECF No. 36 at 10–14. For support, Zen cites Chairman Buerkle's opinion that the rulemaking constituted "the ultimate prejudgment," and that her fellow Commissioners' minds were irrevocably closed. *Id.* at 11.

Despite Zen's argument, agencies may investigate and form opinions on issues that later come before them in an adjudicatory setting without violating the due process rights of the parties to the adjudication. In *Federal Trade Commission v. Cement Institute*, 333 U.S. 683, 688 (1948), for example, the Federal Trade Commission conducted an investigation and issued reports to Congress and the President opining that the cement industry's "multiple basing point system" of pricing amounted to an unlawful restraint of trade. When the Commission then charged the industry with restraining competition through this pricing system, the industry members protested that the Commission had prejudged the issue in its investigation and reports. *Id.* at 700. The Court held that the fact that the Commission had opined that "the multiple basing point system . . . was the equivalent of a price fixing restraint of trade in violation of the Sherman Act" did not necessarily mean that the Commissioners' minds "were irrevocably closed on the subject of the respondents' basing point practices." *Id.* at 701. The Court emphasized that the cement industries participated in the adjudicatory hearings by providing testimony, cross-examination, and arguments, unlike in the earlier investigation, where they had not participated. *Id.* Moreover, if the Commission were not permitted to both investigate and adjudicate the

practices at issue, it would frustrate the purpose of the Commission by immunizing the very practices deemed unfair from any subsequent adjudication. *Id.*

Similarly in this case, in issuing a rule and then hearing the appeal of the Initial Decision and Order in Zen's case, the Commission was properly exercising two of its administrative roles. As in *Cement Institute*, Zen was afforded due process in its adjudication, including by engaging in "three weeks of trial testimony consisting of 2,772 pages of trial transcripts; live testimony by Zen's witnesses; physical exhibits, including Zen's products and packaging and the various evolutions of Zen's on-package warnings" and cross-examination by Zen of Complaint Counsel's experts. ECF No. 40 at 11. The FDO's extensive findings reflect Zen's engagement with and participation in the adjudication. *See* ECF No. 1-2.

Contrary to Zen's argument, the two proceedings did not involve same "core issue," namely "whether the [magnets] should remain on the market." ECF No. 36 at 10. By its very nature, section 9 rulemaking concerns industry-wide safety standards for future production, whereas Section 15 adjudication authorizes recalls of specific products already on the market. *See* 15 U.S.C. §§ 2056, 2064. The rule addressed the risks posed by the SREM industry as a whole, whereas the adjudication was aimed at Zen alone. Though Zen was the only remaining domestic firm at the time the rule was finalized, *see* Safety Standard for Magnet Sets, 79 Fed. Reg. at 59,962–63, that was not the case when the Commission commenced its rulemaking process, nor was the rule's effect limited to Zen. Instead, the rule would have applied proactively to any future SREM distributers who might join the industry. *See id.* at 59,963. The Tenth Circuit rejected a similar argument in *Guivira Min. Co. v. U.S. Nuclear Regulatory Commission*, 866 F.2d 1246, 1261 (10th Cir. 1989), in which an agency's regulation applied to only one site at the time it was promulgated. The court disagreed with petitioner's argument that

the agency's decision was equivalent to an adjudication, noting that the regulations were "written in general terms so as to apply to a prospective class of such sites," and "translate general policy concerns . . . into concrete regulations governing all future sites." *Id.* at 1262. Similarly in this case, though Zen was the only firm affected by the rule at the time it was written, the rule was not an attempt to ban Zen's magnets but to regulate the market as a whole.

Additionally, I do not agree with Zen that both the rulemaking and adjudication sought prospective relief. Instead, as the Commission points out, the rule was an effort to prevent future harm from SREMs, whereas the adjudication of Zen's case was the Commission's attempt to recall magnets already in consumers' hands. Thus the Commission was justified in addressing an industry-wide issue through a rulemaking and then later seeking a recall of Zen's specific product through adjudication.

Additionally, the fact that similar factors or evidence were considered in both the rulemaking and the adjudication does not demonstrate that the Commissioners prejudged the issues in Zen's case. Though the Commission concluded in the rule that "we do not believe that warning labels would adequately reduce the risk of injury presented by these products," such a conclusion does not indicate that the Commissioners' minds were irrevocably closed with respect to that central issue in Zen's case. "Safety Standard for Magnet Sets, 79 Fed. Reg. at 59,975. Instead, the FDO reflects the Commission's consideration of Zen's particularized evidence, including evidence of Zen's marketing and warnings and evidence of known incidents involving the magnets. *See* ECF No. 1-2 at 17–19, 23. As in *Cement Industries*, the fact that Zen was permitted to provide unique evidence and testimony in the adjudication meant that it had the opportunity to dissuade the Commission from the opinions expressed in the rule.

Because the Commission's promulgation of the magnet safety standard did not in and of itself establish that the Commissioners' minds were irrevocably closed to the issues in dispute in Zen's case, their issuing the rule before hearing Zen's appeal does not violate due process.

2. Publicly Made Statements.

Zen argues more convincingly that public statements made by Commissioners about the rulemaking and other related proceedings show that at least one Commissioner prejudged key issues of law and fact at issue in the adjudication. "Litigants are entitled to an impartial tribunal whether it consists of one man or twenty and there is no way which we know of whereby the influence of one upon the others can be quantitatively measured." *Cinderella Career & Finishing Schools, Inc. v. F.T.C.*, 425 F.2d 583, 592 (D.C. Cir. 1970) (internal quotations and citation omitted). However, "[a]n administrative official is presumed to be objective and 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" *United Steelworkers of America, AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1208 (D.C. Cir. 1980) (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941)).

An official's public position, expression of strong views, or proof that she "holds an underlying philosophy with respect to an issue in dispute cannot overcome that presumption." *Id.* However, an agency adjudicator must be disqualified when "his public statements about pending cases reveal[] he 'has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.'" *Id.* (citing *Cinderella*, 425 F.2d at 590). In the Tenth Circuit, "a Commissioner must be disqualified if he or she has prejudged the case or has given a reasonable appearance of having prejudged it." *Kennecott Copper Corp. v. F.T.C.*, 467 F.2d 67, 80 (10th Cir. 1972). In this case, I find that one of the Commissioner's statements demonstrated

an irrevocably closed mind, or at the very least the reasonable appearance of having prejudged the key issues in Zen's appeal.

The statements at issue were made by Commissioners Adler, Kaye, and Robinson. Bear in mind that the final rule was promulgated in October 2014; that the ALJ hearing in the present matter was held in December 2014; that the ALJ's decision was issued in March 2016; and that the Commission's decision that is the subject of the present appeal, the FDO, was reached on October 26, 2017.

Commissioner Robinson made a statement in May 2014 after other sellers of SREMs entered consent agreements with the Commission in which she noted that "[h]igh-powered magnets are responsible for horrific, long-term, and life threatening injuries in infants and children estimated to be in the thousands . . . . The CPSC exists to address just such dangerous products." Zen Magnets, LLC, CPSC Docket 12-2, No. 144 at 24 (Respondent's Memorandum In Support of Motion to Disqualify the Commission or Some of its Members).

In a September 24, 2014 Commission Meeting concerning what would become the Final Rule, Commissioner Adler stated that "the conclusion that I reach is that if these magnet sets remain on the market irrespective of how strong the warnings on the boxes in which they're sold or how narrowly they are marketed to adults, children will continue to be at risk of debilitating harm or death from this product." *Id.* at 14–15.

In the same Commission meeting, then-Chairman Kaye stated that he hoped Zen's CEO and founder's "dreaming will continue and that inspiration will strike again . . . but in a way that can endure." *Id.* Kaye also issued a statement about what would become the final rule on September 29, 2014 in which he said that he "hurt so much" for the family of a child who died as

a result of injuries sustained from ingesting SREMs, and that he "will always think of" the child "when it comes to this rule and the action the Commission has approved." *Id.* at 21.

At the September 24, 2014 meeting, Commissioner Robinson made a statement that "the problem was that *however they were marketed* that these items that were being swallowed by young children and ingested by teenagers and were causing some very, very serious injuries and even deaths." *Id.* at 12 (emphasis added by Zen). She noted that "with the data that we had even though it made a compelling case for this being an unreasonable risk of injury it was understated so the risk was even higher." *Id.* at 24. *Id.*

Additionally, in March 2016 Commissioner Kaye issued a statement after a district court decision enjoined Zen from selling SREMs that were the subject of a previous recall. *Id.*; Zen Magnets, LLC, CPSC Docket 12-2, No. 155 at 4 (citing *United States v. Zen Magnets, LLC*, 15-cv-00955, 2016 WL 1114560 (D. Colo. Mar. 22, 2016)). In that statement, Kaye opined that the court's "decision puts the rule of law and the safety of children above the profits sought by Zen Magnets." Zen Magnets, LLC, CPSC Docket 12-2, No. 144 at 21.

While I do not find that the Commissioners' statements evince antagonism or animus toward Zen as such, I find that Commissioner Adler's statement during the Meeting on the Final Rule demonstrated an irrevocably closed mind, or at the very least a reasonable appearance that he had prejudged the key questions of fact and law at issue in the adjudication. Commissioner Adler's statement that the risks associated with SREMs would persist "irrespective of how strong the warnings on the boxes in which they're sold or how narrowly they are marketed to adults" indicates that he was not capable of judging Zen's appeal fairly on the basis of its own circumstances. *See United Steelworkers*, 647 F.2d at 1208. Instead, his statement reveals that his mind was closed as to the possibility that any marketing or warning strategy might mitigate

the risk of injury from the magnets. The role of warnings and marketing efforts were of central relevance in the adjudication. One of Zen's key arguments was that its warnings, instructions, and marketing could prevent the misuse of its product from which the risk of injury arises. *See* ECF No. 36 at 13. The ALJ had found in the Initial Decision and Order that "the nature of the risk of injury which the product presents is negligible when accompanied by proper warnings and appropriate age restrictions." Zen Magnets, LLC, CPSC Docket 12-2, No. 141 at 19. In contrast, the Commission found in the FDO that warnings could not mitigate the risk of injury. ECF No. 1-2 at 30.

Commissioner Adler's statement indicates that regardless of the particular circumstances or evidence presented by Zen with respect to the efficacy of its warnings or marketing strategy, he would find that the risk of injury could not be mitigated. I am not convinced by the Commission's defense of Commissioner Adler's statement on the grounds that "[h]e did not address the specific brands at issue in the litigation." ECF No. 35 at 20. The Commission's own stance that "because SREMS are functionally identical, and brands are indistinguishable, the physical characteristics of SREMs that give rise to a risk of injury are shared by all brands" indicates that the risks it associated with any magnets would necessarily be imputed to Zen. ECF No. 1-2 at 23. As a result, the only factors Zen might manipulate to establish the safety of its magnets over other distributors' would be the warnings, instructions, or marketing. Therefore, Commissioner Adler's statement indicating that he would deem any brand of SREM dangerous regardless of the efficacy of a particular brand's warnings foreclosed the possibility that Zen could present any evidence about its warnings or marketing that would convince him that Zen was capable of mitigating the risk of injury from its product. In other words, Adler's statement

indicated that he could not judge this "particular controversy fairly on the basis of its own circumstances." *See United Steelworkers*, 647 F.2d at 1208.

The Commission cites *United States v. Morgan*, 313 U.S. 409, 421 (1941), in which a Secretary of Agriculture had written a public letter "vigorously criticiz[ing]" a court decision that had upset an order issued by the Secretary setting maximum rates that market agencies could charge. Though the market agencies "moved to disqualify the Secretary" from subsequent proceedings to fix new rates, the Court found that the Secretary was fit to participate in these proceedings despite his expressing "strong views on matters believed by him to have been in issue." *Id.* The Court emphasized that judges are often in a similar opposition of hearing the same case many times without being accused of having "disqualifying convictions." Thus, nothing in the record disturbed the assumption that the Secretary was "capable of judging a particular controversy fairly on the basis of its own circumstances." *Id.* In this case, in contrast, Commissioner Adler's statement reveals not only a strong view about the dangers of SREMs, but an inflexible view of the potential to mitigate the risk of injury associated with SREMs.

Commissioner Adler's statement is similar to statements found to demonstrate impermissible bias in the Tenth Circuit. In *McClure v. Independent School District Number 16*, 228 F.3d 1205, 1215–16 (10th Cir. 2000), decisionmakers "publicly stated their intent to terminate [] McClure's employment prior to the hearing at which the matter of her termination was to be decided." Similarly in *Staton v. Mayes*, 552 F.2d 908, 914 (10th Cir. 1977), bias was established where three of five school board members made statements prior to a hearing that the superintendent should be fired. The court concluded that "statements on the merits by those who must made factual determinations on contested fact issues of alleged incompetence and willful neglect of duty, where the fact finding is critical . . . left no room for a determination that there

was a decision by a fair tribunal, with the appearance of fairness." *Id.* at 914–15.  Commissioner

Adler's statement indicated his stance on the merits of Zen's case, thereby leaving no room to

find that Zen enjoyed a decision by a fair tribunal.

Moreover, I agree with Zen that Adler's statement is distinct from an agency official's

opinion on a matter of law, as in *Cement Institute*, 333 U.S. at 700–01.  In that case, as noted

above, the Federal Trade Commission had provided reports conveying a legal conclusion that the

pricing system amounted to a restraint of trade.  In this case, in contrast, Commissioner Adler

opined on an issue of fact when he stated that no warning or marketing could mitigate the risk of

injury from SREMs.  As such, the fact that the Commissioner understood the legal and factual

differences between a rulemaking and an adjudication is of no import.  ECF No. 40 at 9.  His

view that warnings or marketing could not mitigate the risks associated with the magnets would

have affected the outcome of the adjudication regardless of the legal standard applied.  Thus,

unlike in *Cement Institute*, where participation by the cement industries in their adjudication was

sufficient to ensure their due process rights were protected, Commissioner Adler's statement in

this case rendered Zen's participation before the Commission futile, since his mind was

irrevocably closed on a key factual question of the efficacy of warnings or marketing.

I am not as troubled by the remaining Commissioners' statements in September 2014.

Commissioner Robinson's statement about the final rule that "the problem was that *however they

were marketed* that these items" were causing injury and death is admittedly similar to

Commissioner Adler's.  Zen Magnets, LLC, CPSC Docket 12-2, No. 144 at 12 (emphasis added

by Zen).  However, her statement does not necessarily address the potential for warnings and

instructions to mitigate the risks associated with SREMs, thereby leaving open the possibility

that her opinion could be swayed by the particular facts about Zen's case.

Additionally, while I find Commissioner Kaye's public statement in March 2016 troublesome, it does not reveal that the Commissioner had prejudged the issues in Zen's case or that he held any particular animus toward Zen. The Commissioner's statement in support of Judge Arguello's decision enjoining Zen from selling recalled magnets was issued before the ALJ's Initial Decision in this case, and thus before the matter had been appealed to the Commission. More importantly, his statement was issued in a distinct context—supporting the enforcement of the Commission's recall orders—that is unrelated to the circumstances of Zen's adjudication. *See* Zen Magnets, LLC, CPSC Docket 12-2, No. 155 at 4 n.7 (noting that the Commission's "pursuit of this case makes clear we will not tolerate the sale of recalled goods in any form."). As a result, his statement does not indicate that he had prejudged the issues that would come before the Commission.

Nevertheless, because a single decisionmaker's bias, or even the reasonable appearance of such, renders an entire adjudication partial and deprives the complainant of an impartial tribunal, Commissioner Adler's statement invalidates the entire Commission's FDO and mandates a remand. *See Cinderella*, 425 F.2d 583, 592 ("The rationale for remanding the case despite the fact that former Chairman Dixon's vote was not necessary for a majority is well established . . . there is no way which we know of whereby the influence of one upon the others can be quantitatively measured.") (internal quotations and citation omitted). Because Commissioner Adler's statement revealed that his mind was irrevocably closed on the key issues before the Commission on appeal, he must be disqualified for purposes of remand of the FDO.

## ORDER

For the reasons stated herein, the Court finds that the Commission's adjudication was not arbitrary and capricious under the APA, but that Zen's due process rights were violated because

Zen was deprived a fair and impartial tribunal in its appeal of the Initial Decision and Order. As a result, the FDO is vacated, the Initial Decision is reinstated, and the matter is remanded to the Commission with directions to provide an impartial tribunal for Complaint Counsel's appeal from the Initial Decision. In particular, the Commission is instructed to conduct the appellate review without the participation of Commissioner Adler.

The Court finds as moot the pending motions at ECF Nos. 2, 35, and 36.

DATED this 11th day of June, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge